UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| INTERNATIONAL BUSINESS MACHINES CORPORATION, | Civil Action No. 18 Civ. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | |
| NATASHA ENGAN, | |
| Defendant. | |

Plaintiff International Business Machines Corporation ("IBM" or "Plaintiff"), by its attorneys Jackson Lewis P.C., for its Complaint against Natasha Engan ("Engan" or "Defendant"), states as follows:

A. **Nature of the Action**

1.      IBM brings this action for monies due and owing to IBM by Defendant, pursuant to the terms of the IBM Long-Term Performance Plan (the "Plan" or "LTPP").

2.      During all relevant times herein, Engan was a participant in the LTPP under which Engan received equity awards, which would be subject to cancellation and rescission if Engan engaged in detrimental activity under the Plan.

3.      Engan forfeited her right to retain the monetary benefits of her equity awards when she voluntarily resigned from IBM effective on or about February 14, 2017 by resignation notice dated January 31, 2017, and then went to work for Deltek Global Consulting ("Deltek"), a direct competitor of IBM, as Senior Vice President on or about March 2017.

4.      IBM brings this action for monies due and owing to IBM by Defendant.

B. **The Parties**

5.      IBM is a corporation organized under the laws of the State of New York

with its principal place of business located in Armonk, New York, within the Southern District of New York.

6.   Engan is an individual and a former employee of IBM.

7.   Engan was employed by IBM as Vice President of Security Financial Services Market.

8.   IBM hired Engan in 2004.

9.   During her long history of employment at IBM, Engan received numerous promotions and pay raises and became a high level, highly compensated executive.

10.   After nearly 13 years of employment at IBM, Engan voluntarily resigned from her position. Shortly after her voluntary resignation from IBM, Engan became employed by Deltek, a direct competitor of IBM.

11.   Upon information and belief, Engan resides in Dover, Massachusetts.

C.  **Jurisdiction and Venue**

12.   The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum of $75,000, exclusive of costs and interest, and there is complete diversity of citizenship between the parties.

13.   This Court has personal jurisdiction over Engan pursuant to the parties' agreement contained in both the LTTP and Terms and Conditions of Your Equity Award: Effective June 8, 2016 ("Equity Award Terms and Conditions").

14.   Venue properly lies in this Court pursuant to 28 U.S.C. § 1391 because IBM's headquarters and principal place of business are situated within this judicial district.

15.   Venue also properly lies in this Court pursuant to the parties' agreement contained in both the LTPP and Equity Award Terms and Conditions.

## D. <u>The LTPP</u>

16.     The LTPP is designed to attract, motivate and retain selected employees of the Company (defined by the LTPP as "IBM and its affiliates and subsidiaries including subsidiaries of subsidiaries and partnerships and other business ventures in which IBM has an equity interest") (hereinafter within this section referred to as the "Company"). These objectives are accomplished by making long-term incentive and other awards under the Plan, thereby providing participants with a proprietary interest in the growth and performance of the Company.

17.     Section 13(a) of the LTPP provides, in pertinent part:

Unless the Award Agreement specifies otherwise, the Committee may cancel, rescind, suspend, withhold or otherwise limit or restrict any unexpired, unpaid, or deferred Awards at any time if the Participant is not in compliance with all applicable provisions of the Award Agreement and the Plan, or if the Participant engages in any 'Detrimental Activity.' For purposes of this Section 13, 'Detrimental Activity' shall include: (i) the rendering of services for any organization or engaging directly or indirectly in any business which is or becomes competitive with the Company, or which organization or business, or the rendering of services to such organization or business, is or becomes otherwise prejudicial to or in conflict with the interest of the Company... (v) a violation of any rules, policies, procedures or guidelines of the Company, including but not limited to the Company's Business Conduct Guidelines... [and] (viii) any other conduct or act determined to be injurious, detrimental or prejudicial to any interest of the Company.

18.     Section 13(b) of the LTPP provides, in pertinent part:

Upon exercise, payment or delivery pursuant to an Award, the Participant shall certify in a manner acceptable to the Company that he or she is in compliance with the terms and conditions of the Plan. In the event a Participant fails to comply with the [Detrimental Activity] provisions...of this Section 13 prior to, or during the Rescission Period, then any exercise, payment or delivery may be rescinded within two years after such exercise payment or delivery. In the event of any such rescission, the Participant shall pay to the Company the amount of any gain realized or payment received as a result of the rescinded exercise, payment or delivery, in such manner and on such terms and conditions as may be required, and the Company shall be entitled to set-off against the amount of any such gain any amount owed to the Participant by the Company. As used herein, Rescission Period shall mean that period of time established by the Committee

3

which shall not be less than 6 months after any exercise, payment or delivery pursuant to an Award.

19. Section 15(f) of the LTPP provides in pertinent part:

In the event that a Participant or the Company brings an action to enforce the terms of the Plan or any Award Agreement and the Company prevails, the Participant shall pay all costs and expenses incurred by the Company in connection with that action, including reasonable attorneys' fees, and all further costs and fees, including reasonable attorneys' fees incurred by the Company in connection with collection.

20. Section 15(e) of the LTPP states that it is governed by New York law and that "recipients of an Award under the Plan are deemed to submit to the exclusive jurisdiction and venue of the federal or state courts of New York, County of Westchester, to resolve any and all issues that may arise out of or relate to the Plan or any related Award Agreement."

**E. IBM's Grant of Equity Awards to Engan**

21. On or about June 8, 2012, IBM granted Engan an Equity Award comprised of 139 shares of RSUs. These RSUs were scheduled to vest on June 8, 2016.

22. On or about June 7, 2013, IBM granted Engan an Equity Award comprised of 131 shares of RSUs. These RSUs were scheduled to vest on June 7, 2016.

23. On or about June 9, 2014, IBM granted Engan an Equity Award comprised of 139 shares of RSUs. These RSUs were scheduled to vest on June 9, 2016.

24. On or about June 8, 2015, IBM granted Engan an Equity Award comprised of 158 shares of RSUs. These RSUs were scheduled to vest on June 8, 2016.

25. IBM's grants to Engan became effective after and were conditioned upon her accepting the terms and conditions of (a) the LTPP under which these long term incentive awards were granted, (b) the Equity Award Agreements ("EAA"), and (c) the accompanying Equity Award Terms and Conditions, including those provisions of the foregoing related to the cancellation and rescission of equity awards.

4

## F.  The EAAs

26.    Engan was required to sign EAAs in order to receive each Equity Award grant.

27.    Each EAA provides:

> IBM may cancel, modify, rescind, suspend, withhold or otherwise limit or restrict this Award in accordance with the terms of the Plan, including, without limitation, canceling or rescinding this Award if you render services for a competitor prior to, or during the Rescission Period.  You understand that the Rescission Period that has been established is 12 months.

28.    The EAAs pertaining to RSUs also stipulates that Engan's "participation in the [LTPP was] voluntary."

29.    The EAA states that it, along with the Equity Award Terms and Conditions document and the LTPP, which are collectively "incorporated [to the EAA] by reference…, constitute the entire agreement between [Engan] and IBM with respect to [her] Award."

## G.  The Equity Award Terms and Conditions

30.    The Equity Award Terms and Conditions between Engan and IBM which apply to Engan's Equity Awards currently subject to rescission, state, in pertinent part:

> All determinations regarding enforcement, waiver or modification of the cancellation and rescission and other provisions of the Plan and your Equity Award Agreement…shall be made in IBM's sole discretion. Determinations made under your Equity Award agreement and the Plan need not be uniform and may be made selectively among individuals, whether or not such individuals are similarly situated.

31.    The Equity Award Terms and Conditions also state, in pertinent part:

> You agree that the cancellation and rescission provisions of the Plan and your Equity Award Agreement are reasonable and agree not to challenge the reasonableness of such provisions, even where forfeiture of your Award is the penalty for violation.

32.    The Equity Award Agreement Terms and Conditions specify that each

EAA is governed by New York law and that recipients "submit to the exclusive jurisdiction and

venue of the federal or state courts of New York, County of Westchester, to resolve all issues

that may arise out of or relate to [an] Equity Award Agreement."

## H. The Noncompetition Agreement ("NCA")

33.     In recognition of her critical role as a senior executive at IBM, and as

consideration for being promoted to a senior executive position, any and all awards granted to

her under the Plan, and for other good and valuable consideration, Engan agreed to the terms and

conditions of a NCA executed on April 9, 2012.

34.     In the NCA, Engan acknowledged and agreed:

during [her] employment with IBM and for twelve (12) months following the
termination of [her] employment . . . , [she] will not directly or indirectly within
the "Restricted Area" (i) "Engage in or Associate with" (a) any "Business
Enterprise" or (b) any competitor of the Company . . . . (Id. § 1(d.)

35.     The NCA provides the following definitions for the defined terms used in

Section 1(d):

(a)     "Restricted Area" is defined as "any geographic area in the world for
which [Engan] worked or for which [she] had job responsibilities,
including supervisory responsibilities, during the last twelve (12) months
of [her] employment with IBM." (Id. § 2(e).)

(b)     "Engage in or Associate with" is defined to mean, among other things,
acting as an "associate, employee, member, consultant, or contractor."
(Id. § 2(c).)

(c)     "Business Enterprise" is defined as "any entity that engages in . . .
competition with any business unit or division of the Company in which
[Engan] worked at any time during the three (3) year period prior to the
termination of [her] employment." (Id. § 2(a).)

36.     Thus, Engan agreed in the NCA that, for a period of one year following

the termination of her employment from IBM she would not (1) work for any competitor of

IBM, or (2) work for any company that engages in competition with any business unit or division

6

of IBM in which she worked in the last three years.

37.     Further, in the NCA, Engan made several other important representations and acknowledgments, including:

(a)     "the business in which [IBM is] engaged is intensely competitive" (Id. § 1(b).);

(b)     her "employment by IBM has require[d]... that [she] have access to, and knowledge of, IBM Confidential Information. (Id.); § 2(d);

(c)     her "services to the Company are, and will continue to be, extraordinary, special and unique" (Id. § 1(b).);

(d)     "the Company would suffer irreparable harm if [she failed] to comply with [the noncompetition...covenants]" (Id. § 3.); and

(e)     "the restrictions set forth in [the covenants] are reasonable as to geography and duration." (Id.)

## I.   Engan's Equity Award Gains Subject to Rescission

38.     On or about June 8, 2016, 139 of the RSUs awarded to Engan on June 8, 2012 vested and were released into Engan's Morgan Stanley account. The value of these RSUs as of on or about June 8, 2016 was $21,346.23.

39.     On or about June 7, 2016, 131 of the RSUs awarded to Engan on June 7, 2013 vested and were released into Engan's Morgan Stanley account. The value of these RSUs as of on or about June 7, 2016 was $20,082.96.

40.     On or about June 9, 2016, 139 of the RSUs awarded to Engan on June 9, 2014 vested and were released into Engan's Morgan Stanley account. The value of these RSUs as of on or about June 9, 2016 was $21,304.53.

41.     On or about June 8, 2016, 158 of the RSUs awarded to Engan on June 8, 2015 vested and were released into Engan's Morgan Stanley account. The value of these RSUs as of on or about June 8, 2016 was $24,264.06.

42.     Engan gained a total of $86,997.78 in Equity Awards, as described in Paragraphs 38-41 that is now subject to rescission.

### COUNT I— Breach of Terms of Equity Awards

43.     IBM repeats and realleges each and every allegation contained in Paragraphs "1" through "42" of the Complaint, with the same force and effect as set forth herein at length.

44.     On or about January 31, 2017, Engan voluntarily resigned from IBM.

45.     Shortly thereafter, IBM learned that Engan commenced employment with Deltek.

46.     Engan had previously acknowledged that, pursuant to the LTPP, if she chose to join a competitor of IBM within the Rescission Periods, as defined in the EAAs, her awards issued under the LTPP would be forfeited.

47.     Engan's employment with Deltek qualifies as "Detrimental Activity" as that term is defined under Section 13(a)(i), (v), and (viii) of the LTPP entitling IBM to seek rescission of Engan's Equity Awards she gained during the 12 month period prior to accepting a job at Deltek.

48.     On December 13, 2017, IBM sent Engan a letter advising Engan that becoming employed by Deltek entitled IBM to rescind Engan's Equity Awards totaling $86,997.78.

49.     IBM's December 13, 2017 letter directed Engan to repay IBM by January 3, 2018.

50.     Engan has failed to remit payment to IBM despite this December 13, 2017 demand.

51.     Engan owes IBM $86,997.78.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff IBM demands judgment in its favor and against Engan as follows:

1.       Payment by Engan to IBM of a sum not less than $86,997.78, together with interest;

2.       Awarding IBM its attorneys' fees, costs, and disbursements incurred as a result of this action; and

3.       Awarding IBM such other and further relief as the Court deems just and proper.

Respectfully submitted,

JACKSON LEWIS P.C.
666 Third Avenue
New York, New York 10017
(212) 545-4000

Dated: April 13, 2018          By: _____
      New York, NY                  Dana G. Weisbrod (DW 0527)
                                    Daniel D. Schudroff (DS 0525)

ATTORNEYS FOR PLAINTIFF
INTERNATIONAL BUSINESS MACHINES
CORPORATION